**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

JAMES LEE STULL,

      Plaintiff,

v.                           Civil Action No.  1:13CV211
                                (The Honorable Irene M. Keeley)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

James Lee Stull ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on June 25, 2010, alleging disability since June 1, 2010 due to "severe bad pain" and hypertension (R. 141, 162, 166). Plaintiff's applications were denied at the initial and reconsideration levels (R. 65-67). Plaintiff requested a hearing, which Administrative Law Judge Jeffrey P. LaVicka ("ALJ") held on April 6, 2012 (R. 24). Plaintiff, represented by counsel, and Eugene Czuzcman, a vocational expert ("VE") testified (R. 24-54). On April 16, 2012, the ALJ entered a decision finding Plaintiff was not disabled (R. 12-20). Plaintiff

timely appealed the ALJ's decision to the Appeals Council, and on July 22, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. FACTS

Plaintiff was born on June 10, 1959, and was fifty (50) years old at the time of his onset date (R. 19). He had a tenth grade education and past relevant work as a lumber grader (R. 32, 35).

Dr. Witkowski examined Plaintiff on March 25, 2010. Plaintiff was his "usual self." He had no headaches; dizziness; significant chest pain; shortness of breath; edema; or "out of the ordinary" muscle aches, pains, or weaknesses. Plaintiff had chronic back pain and sciatic pain. He had "a lot of pain in his hips at times." He had good days and bad days. Plaintiff stated he was unemployed and could not afford back surgery. Plaintiff's blood pressure was 136/78. Dr. Witkowski's examination showed no "apparent distress." Plaintiff's paraspinal muscles and lumbar spine were nontender. He had no spasm or swelling. Dr. Witkowski found Plaintiff had "fairly good range of motion and [was] moving a lot better than usual." Dr. Witkowski found Plaintiff's hypertension and hyperlipidemia were stable. As to Plaintiff's chronic low back pain with sciatica, Dr. Witkowski noted there was "not much [he could] do here." Dr. Witkowski informed Plaintiff that "with the new health care plan," he could "maybe" get insurance coverage that would "enable him to get surgical correction." Dr. Witkowski prescribed Enalapril, Metoprolol, Simvastatin, Roxicodone, and Flexeril (R. 259).

Dr. Witkowski examined Plaintiff on July 8, 2010. Plaintiff reported "no real complaints." He was his "usual self." He had chronic back pain and the pain "going down the left leg" was "getting pretty bad." He had a "little burning and tingling." He was "in a bit of pain." Plaintiff

reported he had tension headaches and occasional chest pain, which was "sharp" and resolved itself in "maybe a minute." Plaintiff had "no unusual aches, pains or weakness." Dr. Witkowski noted Plaintiff's blood pressure was 184/84. His low back was "a little tender . . . with some decreased range of motion, no spasm or swelling." Plaintiff's patellar reflexes were "1+ symmetric, ankle jerks [were] 1-2+ and symmetric." Dr. Witkowski diagnosed hypertension, hyperlipidemia, and chornic low back pain with sciatica. Dr. Witkowski prescribed Enalapril, Toprol, Simvastatin, Ibuprofen, Flexeril, and Roxicodone. Plaintiff signed a "new narcotic contract" and a urine screen was ordered (R. 261).

Dr. Pascasio, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff on September 2, 2010. Dr. Pascasio found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 248). Dr. Pascasio found Plaintiff should never climb ladders, ropes, or scaffolds but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 249). Dr. Pascasio found Plaintiff had no manipulative, visual, or communicative limitations (R. 250-51). Dr. Pascasio found Plaintiff should avoid concentrated exposure to hazards and extreme heat and cold (R. 251). Dr. Pascasio reduced Plaintiff's residual functional capacity ("RFC") to light. Dr. Pascasio noted Plaintiff stated he could not stand on his feet or sit "for very long." Plaintiff stated he could not twist, bend, or lift "very much." Dr. Pascasio noted Plaintiff had "troubles dressing himself." He could "mow but only for very short periods of time." Plaintiff stated he could do "little things around the house because that help[ed] keep him from getting stiff," but he could not "do much." Plaintiff stated "15 lb [was] enough to cause him alot (sic) of pain when

holding" (R. 252).

Plaintiff presented to Dr. Witkowski on October 12, 2010, for a "regular visit." His blood pressure was "a little elevated." He had no "unusual aches, pains or weakness." Plaintiff's low back had been "more bothersome[,] but [Dr. Witkowski" did go ahead and . . . did discontinue his Roxicodone because of an abnormal urine drub screen during his last visit." Plaintiff had "not been doing much" for his back pain. He reported muscle spasms but no other complaints. Plaintiff's blood pressure was 160/104. Dr. Witkowski found Plaintiff was in no apparent distress. He appeared to be "his usual self." Plaintiff was alert and oriented, times three (3). He had no sensory or motor deficits; his Romberg test was negative. Dr. Witkowski diagnosed headache, hypertension, hyperlipidemia, and chronic low back pain with sciatica. Dr. Witkowski prescribed Enalapril, Toprol, Simvastatin, Ibuprofen, Tramadol, and Flexeril (R. 262).

On November 8, 2010, Plaintiff completed a Function Report - Adult. He wrote he was in constant pain. He could stand or sit for fifteen (15) minutes (R. 202). Plaintiff wrote he woke every hour during the night due to pain, got out of bed and walked, then returned to bed to sleep for another hour until he had to walk again due to pain. Plaintiff could feed and provide water to his dogs. Plaintiff had difficulty putting on his shoes and socks and bending to bathe below his knees (R. 203). Plaintiff did not need reminders to care for his personal needs or take medication. He did not cook for himself because he could not stand long enough to cook. Plaintiff attempted to "maintain" his "very small yard." He worked for ten (10) or fifteen (15) minutes then would sit for the same amount of time. He could perform this way for "a couple hours." It took Plaintiff a "couple" days to complete the yard work; he did this every two (2) weeks (R. 204). Plaintiff went outside every day; he walked, drove a car, and would be driven in a car. He could go out alone. He shopped for

4

food and essentials. Plaintiff accompanied his wife when she shopped for one (1) or two (2) hours; he would "take breaks" and sit on benches. Plaintiff wrote he could pay bills, count change, handle a savings account, and use a checkbook (R. 205). Plaintiff watched television, listened to the radio, and played with his grandchildren when he was able. He had difficulty "getting down" to play with his grandchildren. Plaintiff's symptoms had worsened during the past two (2) years. Plaintiff's son visited him once a week. Plaintiff did not need to be reminded to go places; he did not need anyone to accompany him when he went places (R. 206). Plaintiff did not socialize "very much" because he had difficulty sitting. Plaintiff's symptoms affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, follow instructions, and get along with others. Plaintiff could lift ten (10) pounds of potatoes, but not repeatedly. When he walked, he had a "hot burning sensation with a knife sticking" him. Plaintiff could walk one hundred (100) feet before he had to stop and rest; he needed to rest for three (3) or five (5) minutes. Plaintiff had difficulty "paying attention" when he was "hurting." Plaintiff could not complete tasks due to pain; he could follow instructions if there were "not too many steps" (R. 207). Plaintiff wrote he handled stress in a "normal" manner. Plaintiff was concerned about not being able to provide for his family. Plaintiff used a cane to ambulate (R. 208).

On December 9, 2010, Dr. Reddy, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Reddy found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 264). Dr. Reddy found Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl (R. 265).

Plaintiff had no manipulative, visual, or communicative limitations (R. 266-67). Dr. Reddy found Plaintiff should avoid concentrated exposure to vibration and hazards and his exposure to extreme cold and heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 267). Dr. Reddy based these findings on Plaintiff's statements that he cannot stand or his feet of sit for very long; could not twist, bend, of lift; could mow but for short periods; attempted to do "some little things around the house" to help him from "getting stiff"; and he experienced pain when he held fifteen (15) pounds. Dr. Reddy noted Plaintiff alleged he had chronic lower back strain and pain with questionable sciatica, hypertension, and high cholesterol. Dr. Reddy found Plaintiff was partially credible "with supporting medical evidence as noted on page 8 (of the assessment). Dr. Reddy noted Plaintiff's gait and ranges of motion were limited but he had no neurological deficit. Dr. Reddy found Plaintiff's activities of daily living "seem[ed] disproportionate to his physical evidence" (R. 268).

On January 18, 2011, Plaintiff saw Dr. Witkowski for a "regular visit." He had "no real big problems," but had "noted a little bit more pain at times." He also noted that he was "having some swelling across the knuckles of his hands." Plaintiff reported that he had no "anginal type" chest pain and only experienced an "occasional slight headache." He also reported an "occasional sharp pain." Dr. Witkowski noted that as to Plaintiff's chronic back pain, "he has good and bad days. He states that he still does have sciatica going down the left leg all the way to the toes." Plaintiff was taking his medications "as directed." Upon examination, Dr. Witkowski noted that Plaintiff "was a little bit uncomfortable from his back at times. He needs to get up and down." Plaintiff's back had "no real tenderness . . . and no spasm or swelling of the paraspinal muscles." Dr. Witkowski assessed hypertension, hyperlipidemia, and chronic low back pain with sciatica. He prescribed

Toprol, Simvastatin, Vasotec, Naproxen, Tramadol, and Flexeril (R. 277).

Plaintiff returned to see Dr. Witkowski on April 25, 2011 with complaints that his back was "just really giving him more problems and he just cannot take it anymore." Plaintiff reported that he was "having a lot of pain going down his left leg still and at times it goes all the way down the entire leg to the foot." Plaintiff stated that he would also experience pain in his right leg, numbness "on and off at times" in both legs, and that his back was always bothering him. Plaintiff reported that he was having a lot of spasms and that he was unable to sleep well because of his back pain. His blood pressure and cholesterol were "doing fine" and he was taking his medications "as directed." Upon examination, Dr. Witkowski noted that Plaintiff had "a lot of difficulty moving around because of his back pain." His back was "tender across the entire lumbar area and on the spine itself." Dr. Witkowski noted "no spasm or swelling of the paraspinal muscles." Plaintiff's left straight leg raising test was "positive with literally any movement", and Plaintiff could only raise his leg "actively to about 15 degrees." As to Plaintiff's right leg, "he had pain develop at about 10 degrees and he could actively elevate to about 60 degrees." Plaintiff's "patellar and ankle reflexes were 2+, symmetric, and brisk." Dr. Witkowski assessed hypertension, stable; hyperlipidemia; and chronic low back pain with sciatica. He prescribed Vasotec, Metoprolol, Simvastatin, Flexeril, and Tramadol. (R. 276).

On May 2, 2011, Dr. Witkowski wrote a letter, addressed "To Whom It May Concern," relative to his treatment of Plaintiff. Dr. Witkowski wrote that Plaintiff had a "medical history consisting of hypertension, hyperlipidemia," and chronic low back pain that was "secondary to spondylolisthesis and a herniated disc at L5-S1." Dr. Witkowski wrote Plaintiff medicated with narcotics. He had been evaluated at the West Virginia University Hospital Spine Center; surgery was

recommended, but Plaintiff could not afford to undergo surgery. Dr. Witkowski wrote Plaintiff's pain radiated to his legs and toes; he experienced numbness and tingling; he had not worked for years; and could not sustain "any type of physical activity for any duration because of the chronic problem." Dr. Witkowski wrote Plaintiff medicated with Flexeril and Tramadol. He opined he did "not see [Plaintiff] getting much better in the long run" and was "unsure if he would benefit from surgery at this point." Dr. Witkowski wrote that Plaintiff had spondylolisthesis "as well, in which surgical correction of that may be somewhat beneficial, but this is definitely something that has to be addressed more with orthopedics." Dr. Witkowski wrote Plaintiff's hypertension and hyperlipidemia were "under faily good control" (R. 271).[1]

Plaintiff returned to see Dr. Witkowski on July 26, 2011. He reported that he had been to the Newburg clinic because of a bulging in his left groin. A physician at that clinic told him that he had a hernia that was "easily reducible." Plaintiff denied headaches, dizziness, chest pain, edema, shortness of breath, and unusual aches and pains. He stated that he still had "chronic low back pain that is rather bothersome and bilateral sciatica, more so on the left." Plaintiff reported having numbness on his left side more so than on his right. He was taking his medications "as directed." Upon examination, Dr. Witkowski noted that Plaintiff had "a lot of difficulty getting up and down

---

[1]A letter, dated June 11, 2007, was written by Dr. Witkowski. According to a handwritten notation at the end of the letter, Plaintiff "had the Doctor to write this back in 07 and then [he] decided to try to work a little longer if [he] could." Dr. Witkowski wrote Plaintiff had hypertension, hyperlipidemia, spondylolisthesis, and herniated L5-S1 discs. Plaintiff's recent MRI showed "no improvement of his condition"; he was positive for "persistent grade II anterolisthesis of L5 on S1 secondary to bilateral spondylolithesis with significant bilateral neural foraminal stenosis." He was being treated by a chiropractor and medicating his condition with Roxicodone, which provided minimal relief. Dr. Witkowski opined that Plaintiff had difficulty working and was "no longer able to carry on his present activity[,] which require[d] a lot of physical labor." Plaintiff could not stand or sit for prolonged periods of time, could not frequently bend, should avoid twisting, and should avoid heavy lifting (R. 272).

on the exam table, especially from a supine position, because of his back, which is status quo." Plaintiff's back was "nontender" and had a "decreased range of motion", but Dr. Witkowski did not note any spasm or swelling of Plaintiff's paraspinal muscles. He noted an inguinal hernia that was "easily reducible" in Plaintiff's left groin. Plaintiff had "some tenderness" in that area. Dr. Witkowski assessed hypertension, stable; hyperlipidemia; chronic low back pain with sciatica, left greater than right, status quo; and probable left inguinal hernia. He prescribed Toprol, Enalapril, Simvastatin, Flexeril, and Tramadol (R. 275).

Plaintiff saw Dr. Witkowski on August 10, 2011 with complaints of a swollen left knee. Plaintiff stated that "over the past week the knee has really swelled up and has been red and hurting him quite a bit." He noted that he had a thorn in his left knee in the spring that had "festered for a few days." Plaintiff pulled the thorn out and "noted for about four or five days some redness and swelling." Plaintiff reported "no other new problems." Upon examination, Dr. Witkowski noted that Plaintiff's left knee was tender, "definitely swollen and very fluctuant." He also noted erythema and warmth. He assessed left knee pain and swelling, warmth, with questionable septic arthritis. He told Plaintiff that he needed to go to "either Ruby Memorial or Mon General emergency room" to take care of lab work to take care of a possible infection and to "actually see if the joint itself has become any type of bony compromise." Plaintiff agreed to go to the emergency room (R. 274).

Plaintiff returned to see Dr. Witkowski on August 22, 2011 with complaints of low back pain. Dr. Witkowski noted that Plaintiff "had a herniated disc, L5-S1" and "has had some sciatic pain at times." Plaintiff stated that "for the past 3-4 days his back has just been terrible." After his visit on August 10, 2011, Plaintiff went to the emergency room at Mon General, where they "drained stuff from his knee that looked like urine." Plaintiff said his left knee was still bothering him and

that his back had "become much worse." He also said that his right leg was numb from the hip to the knee. Upon examination, Dr. Witkowski noted that Plaintiff was in "obvious distress from his back pain, cannot get comfortable at all." Plaintiff felt "very tense and tight in the right paraspinal muscles." He was "extremely tender" there and was tender "both along the spine and in the left as well, but not as severe." Plaintiff was "very tender over the right sciatic notch." Plaintiff's patellar and ankle reflexes were 2+, symmetric, and present. Dr. Witkowski assessed low back pain and left knee pain and swelling. He prescribed Toradol, Lortab, and Flexerl. He told Plaintiff that as to his knee, he would "undoubtedly need to follow-up with Orthopedics" (R. 273).

Two days later, on August 24, 2011, Plaintiff saw Nurse Practitioner ("NP") Phillips with "complaints of ongoing low back pain which started over the weekend." Plaintiff noted that his pain began after he had been moving some wood, and stated that he had "done this before" and it had not bothered his back. He stated that his back hurt across the lower lumbar area and that the pain was greater on his right side. The pain radiated down his right anterior thigh to above his knee. All activity made Plaintiff's pain worse, and he experienced back pain while at rest. Plaintiff rated his "back pain at rest 4 to 5 out of 10 and greater than 10/10 with any activity, i.e., getting up from a sitting to standing position, bending, driving, going up steps or any exertional activity or lifting greater than 15 pounds." Plaintiff also thought that his blood pressure medication was not "helping much." Upon examination, NP Phillips noted that Plaintiff's back was "[e]xtremely tender with guarding across lumbar area, greater at right." Plaintiff had "[p]ositive paraspinal spasms at L5 through L7, slight bulging noted at spine, L5." His motion and activity were "slow" because of his back pain. Plaintiff was unable to do leg raises, forward bend, and heel and toe walk because of his back pain, and NP Phillips had to assist him in getting up from a supine to a sitting position. She

assessed hypertension, not controlled and exacerbation of sciatica due to disc disease. NP Phillips encouraged Plaintiff to sleep on a medium to firm surface, to apply warm, moist heat or ice as needed, and to do back exercises at home. She prescribed Medrol, Cymbalta, Flexeril, Hydrocodone, and Ketorolac. She instructed Plaintiff to go to the DHHR and "apply for a medical card and/or get a letter of denial so can follow through with treatment plan." Plaintiff was also referred for an updated MRI (R. 283-84).

On September 14, 2011, Plaintiff told NP Phillips that Cymbalta did help with some of his lower back pain "but not completely." He continued to complain of "chronic low and mid thoracic back pain." Plaintiff had gone to the DHHR and was "planning on receiving his letter of denial tomorrow so that he can be referred for MRI, etc." He experienced most of the pain in his lower spine but noted that he had previous trauma to both spinal areas. Plaintiff stated that his pain was worse "with any activity and sleeping at night." He reported that he could not stand to sleep in a bed because it made his pain "so bad." Plaintiff also continued to complain of sciatica pain. Upon examination, NP Phillips noted that Plaintiff had mild bulging at his lumbar area, that his thoracic spine was intact, and that both areas were "tender to palpate with mild spasms, no inflammation." Plaintiff's "[l]eg raises, forward, bent, heel and toe walk" were positive for lumbar back pain. NP Phillips noted that Plaintiff was "in moderately acute back pain." She assessed hypertension, not controlled and chronic thoracic/lumbar back pain with degenerative disk disease. She prescribed Toprol, Vasotec, Medrol, Toradol, Celebrex, and Neurontin (R. 282).

Dr. Witkowski saw Plaintiff again on October 19, 2011. Plaintiff reported that his pain was "tolerable and better controlled" since started taking Cymbalta, Celebrex, and Neurontin. Plaintiff stated, "It's actually helping pretty good." He denied other complaints and noted that he had a spinal

MRI scheduled for October 28, 2011 at Ruby Memorial Hospital. Upon examination, Dr. Witkowski noted that Plaintiff's back "[a]t thoracic and lumbar spine [was] tender to palpate" and that he had "mild spasms." He also noted "[m]ild lateral curvature of the thoracic spine." Plaintiff had no "spinal bulging, masses or inflammation" but his "[l]eg raises, forward bend, heel and toe walk" were "positive for low back pain." Dr. Witkowski noted that Plaintiff appeared "more calm and relaxed and definitely in less pain this examination." He assessed hypertension, controlled and chronic thoracic and lumbar back pain due to degenerative disc disease. He prescribed Toprol, Vasotec, Cymbalta, Celebrex, and Neurontin (R. 281).

Plaintiff underwent MRIs of his lumbosacral and thoracic spine at WVU Healthcare Center for Advanced Imaging on November 18, 2011. The impression of Plaintiff's thoracic spine was for "[m]ild thoracic scoliosis in the midthoracic spine. No compression fracture or cord compression or cord abnormality seen. No thoracic disk herniation seen" (R. 280). The impression of Plaintiff's lumbosacral spine was for "(1) Chronic appearance of bilateral L5 spondylolysis with prominent grade 1 spondylolisthesis"; "(2) Degenerative disk disease L4-L5 with disk bulging and small extrusion noted which is central broad extrusion with some mild right-sided asymmetry"; "(3) L3-L4 disk shows mild bulging"; "(4) L1-L2 disk with small central disk extrusion and caudal migration"; and "(5) L4-L5 disk level has deteriorated in appearance since 30 May 2007. The L1-L2 disk level has deteriorated in appearance since 30 May 2007" (R. 279).

On December 20, 2011, Dr. Daffner of the WVU Spine Center reviewed Plaintiff's MRIs. His impression was for "DDD of Lumbar Spine; Lumbar Spondylolisthesis; Lumbar Spondylolysis; Lumbar Stenosis; Stenosis compression–Moderate." He also noted that Plaintiff had "Grade 1 isthmic spondylolisthesis, severe L5 root compression in foramina, some R sided stenosis due to L4-

5 disc bulge." He sent Plaintiff for a "bilateral L5-S1 TEESI" and noted that he would see Plaintiff in the clinic one to two weeks after the injection (R. 278).

Plaintiff saw Dr. Jones, a resident at the WVU Department of Orthopedics, on January 23, 2012. Plaintiff reported a "30+ year history of low back pain that has just progressively gotten worse over the last few years." He noted that he had a "flare up" about six (6) months ago and that his family physician prescribed Neurontin. Plaintiff reported that since beginning Neurontin his pain has "improved; however, some days it gets worse, some days it is better." Plaintiff described his pain as being "5/10 at this point" and that it ran "from his lower back down the posterior aspect of his legs and then laterally into his calves and then around to the top of his foot and also on the right side, there is some pain that kind of runs on the lateral side of his thigh and then over to the anterior part of his knee." Trying physical therapy and a chiropractor made his pain worse; however, he had tried those many years ago. Plaintiff reported that he was able to walk approximately 300 feet before having "to either sit down or bend forward to improve his pain" (R. 285). Upon examination, Dr. Jones noted that Plaintiff had "some mild tenderness to palpation in the lower back in the lumbar region." His blood pressure was 141/92. Plaintiff's range of motion at his bilateral hip joints did "not have any significant pain" (R. 286). Dr. Jones noted that Plaintiff had "5/5 hip flexor strength quadriceps, hamstrings, tibialis anterior and gastroc soleus bilaterally" but had "4/5 EHL on the right and 5/5 on the left." Plaintiff had "decreased sensation in the dorsum of the medial side of his right food as well as on the plantar surface of the left foot." His deep tendon reflexes were "2/4 bilaterally in the triceps, biceps, patellar and Achilles tendon." He had a "downgoing Babinski reflex bilaterally and no clonus" (R. 287).

Dr. Jones reviewed the X-rays of Plaintiff's lumbar spine and his November 18, 2011 MRI

(R. 287). The impression from the X-ray was for "[b]ilateral L5 spondylolysis and L5-S1 grade II anterolisthesis without radiographic evidence of hypermobility on flexion and extension views." Plaintiff also had a "mild left curvature of the lumbar spine" and "[s]evere degenerative disk changes including disk space height loss, endplate sclerosis and osteophyte formation . . . at the L5-S1 level" (R. 288). Dr. Jones assessed lumbosacral spondylolisthesis with radiculopathy symptoms. He indicated that Plaintiff would "undergo a bilateral selective nerve root block at the L5-S1 level to see if this has any effect in relieving his pain." Plaintiff was not interested in surgery for his back pain because of "family history of back problems and surgeries and his family members did not appear to get much better when they had back surgery." Plaintiff was to follow up in one to two weeks after receiving the L5-S1 nerve root blocks (R. 287).

Administrative Hearing

Plaintiff was 52 years old at the time of the administrative hearing (R. 29). He and his wife had two foster children, ages two (2) and three (3). Plaintiff's wife "mostly" cared for the children, but Plaintiff played with them. They received approximately $1,200.00 per month as reimbursement for the children's expenses (R. 30). Plaintiff drove himself to the hearing; it took him about 45 minutes to complete the drive, and he did not make any stops along the way (R. 31-32).

Plaintiff testified that he was unable to work because of pain in his back and knee (R. 34). He had been thinking of quitting work "clear up" through 2008. He began to look for other work after his company closed down but eventually thought that he would not be able to perform other work. Plaintiff's most recent job was at Coastal Lumber Company. He was responsible for grading lumber, which involved rolling boards over (R. 35). The average board weighed ten (10) to twenty-five (25) pounds. However, he also had to lift heavier planks. Before that, Plaintiff worked as a

14

lumber sawyer, which involved lifting, rolling, and sawing logs. He left his job when Coastal Lumber Company shut down (R. 36).

Plaintiff testified that the pain from his back and knee interfered with his abilities to lift, twist, and bend. He could not stand on his feet for long and had to keep "sitting down in a recliner and kicking [his] feet up" (R. 37). Plaintiff used hot compresses on his back. He was able to dress and shower "with a little trouble" (R. 38). Plaintiff "very seldom" helped with cooking (R. 39). He spent weekends watching television and playing with his foster children and grandchildren (R. 40).

Plaintiff's attorney then questioned him about his conditions. Plaintiff testified that he cannot be on his feet for more than ten (10) minutes before he has to "bend over to get relief or sit down or lean on something." He experiences pain from the bottom of his back, down his legs, to his ankles and toes (R. 40). His pain was worse in his left leg. Plaintiff testified that he had been having trouble with his knee for about a year, and that a doctor told him he had bursitis (R. 41). His pain became "unbearable" if he tried to lift something heavier than ten (10) pounds (R. 42). Plaintiff testified that his pain was "always getting worse" (R. 44).

Plaintiff testified that his daily activities included taking his medications with his coffee, sitting in a chair, and putting his feet up to watch the news while waiting until the pain medication "kick[ed] in." Plaintiff would then go outside for a while and "walk around." He would also "play with the kids." He testified that he would sit in the recliner every few hours throughout the day for approximately half an hour to 45 minutes at a time (R. 45). The last time Plaintiff mowed grass was the year before his hearing, and he mowed a "fairly small" area (R. 45-46). Plaintiff would not be able to mow a larger area unless he took his chair with him (R. 46). When asked by the ALJ, Plaintiff indicated that since being prescribed Neurontin, his pain has returned to "where it was

before pretty much tolerable" (R. 47).

The ALJ asked the VE the following hypothetical question:

[A]ssume a hypothetical individual of the same age, education and work experience as the claimant, retains the capacity to perform light work with a sit/stand option, allowing the person to briefly for one to two minutes, alternate sitting or standing positions at 30-minute intervals without going off task. Who is limited to no foot control operations bilaterally. Who is limited to occasional posturals, except no climbing of ladders, ropes scaffolds.

Must avoid concentrated exposure to extreme cold and heat. Must avoid concentrated exposure to excessive vibration. Must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving. Can such an individual perform the past work of the claimant as it was actually performed or as it is customarily performed per the DOT?

The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of inserting machine operator, with 82,000 jobs nationally and 375 jobs regionally; plumbing hardware assembler, with 49,800 jobs nationally and 75 jobs regionally; and cleaner polisher, with 59,000 jobs nationally and 100 jobs regionally (R. 49-50).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ LaVicka made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since June 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*)

3. The claimant has the following severe impairments: chronic low back pain syndrome with sciatica; hypertension; hyperlipidemia; degenerative disc disease ("DDD") of the lumbar spine; and bursitis of the left knee (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments

16

that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 14).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has had the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) with additional limitations. More specifically, the claimant can lift up to 20 pounds occasionally; lift/carry up to 10 pounds frequently; stand/walk with normal breaks for up to 6 hours in an 8-hour workday; and sit with normal breaks for up to 6 hours in an 8-hour workday. However, the claimant requires a sit/stand option allowing him to briefly, for 1 to 2 minutes, alternate sitting or standing positions at 30-minute intervals without going off task. The claimant is limited to no foot control operation bilaterally. He can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders/ropes/scaffolds. Lastly, the claimant must avoid concentrated exposure to extreme cold, extreme heat, and excessive noise; and must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving (R. 15).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565) (R. 18).

7.  The claimant was born on June 10, 1959, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)) (R. 19).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2010, through the date of this decision (20 CFR 404.1520(g)) (R. 20).

# IV. DISCUSSION

## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.  Because Mr. Stull had an impairment that nearly met Listing 1.04(A) and Dr. Witkowski provided a well-supported opinion that showed Mr. Stuff incapable of sustaining physical activity and the ALJ gave less than

18

substantial weight to the SSA doctors who created a Light RFC then this Court must find that the ALJ erred by finding Mr. Stull capable of performing Light work; and

2.  Because the ALJ's RFC formulation was not based on any substantial evidence then this Court must remand this case to allow the proper formulation of Mr. Stull's RFC.

(Plaintiff's Brief at 6-15.)

The Commissioner contends:

1.  Plaintiff did not meet or medically equal Listing 1.04A;

2.  The ALJ reasonably evaluated Dr. Witkowski's May 2, 2011, Disability Letter; and

3.  The ALJ did not rely on his lay opinion to formulate Plaintiff's RFC.

(Defendant's Brief at 9-14.)

## C.    Listing 1.04A

As part of his first contention for relief, Plaintiff alleges that "[t]he ALJ provided no substantive analysis of [his] near Listing 1.04(A) level impairment."  (Plaintiff's Brief at 7.) According to Plaintiff, the ALJ "should have compared the Listing criteria to [his] symptoms", and that without "such an explanation, it is simply impossible for a reviewing Court to tell whether there was substantial evidence to support the determination."  (Id. at 8.)  Defendant asserts that Plaintiff did not meet his burden of demonstrating that he met or medically equaled Listing 1.04A. (Defendant's Brief at 9-11.)

Listing 1.04A provides:

*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1.

The Commissioner argues that Plaintiff failed to meet hia burden of proving that his impairments satisfy Listing 1.04A. He cites <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990), for the proposition that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." The undersigned finds that the Commissioner has taken this quote out of context. It is a correct quote for then-existing SSR 83-19. However, it is not the ruling in <u>Sullivan</u>. Instead, the <u>Sullivan</u> Court held that the Commissioner's regulations and rulings requiring that a child could only qualify for SSI if he met a listing "did not carry out the statutory requirement that SSI benefits shall be provided to children with 'any . . . impairment of comparable severity' to an impairment that would make an adult 'unable to engage in any substantial gainful activity.'" <u>Id.</u> at 541. Therefore, <u>Sullivan</u> has no value to resolution of the specific issue raised by Plaintiff.

When evaluating whether a claimant meets one or more of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way." <u>Id.</u> at 1173. "The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings." <u>Fraley v. Astrue</u>, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009) (citing <u>Warner v. Barnhart</u>, Civil Action No. 1:04-cv-8, Docket No. 18 at 7-9, 11 (Final Order of Stamp, J., filed Mar.

29, 2005)).

With respect to Plaintiff's impairments and whether they met Listing 1.04A, the ALJ wrote:

> In so concluding, and despite the claimant's representative asserting at the hearing that no listings were alleged or met, the undersigned has appropriately evaluated medical and other evidence pertaining to the claimant's medially [sic] determinable impairments in conjunction with all relevant security criteria contained within, and including, but not limited to, the *1.00 Musculoskeletal System and 4.00 Cardiovascular System* series of impairments.

> Other evidence considered in reaching the foregoing conclusions is discussed below in conjunction with the determination of the claimant's residual functional capacity.

(R. at 14.)

Here, the ALJ only stated that Plaintiff's impairments did not meet any of the Listings without providing any analysis. Because of this, the ALJ did not meet the requirements of Cook, as he did not compare Plaintiff's "actual symptoms to the requirements of [Listing 1.04A] in more than a 'summary way.'" Cook, 783 F.2d at 1173. As the Fourth Circuit noted in Cook, "[a]dministrative determinations are required to be made in accordance with certain procedures that facilitate judicial review." Id. Here, the undersigned finds no explanation that the Court can rely on that indicates why Plaintiff does not meet Listing 1.04A.

Nevertheless, the undersigned finds that the ALJ's error is harmless. In his brief, Plaintiff concedes that "his condition nearly met Listing 1.04(A)." (Plaintiff's Brief at 6.) He also concedes that "[t]here is no evidence in the file showing motor loss/atrophy." (Id. at 7.) In his response to the Commissioner's motion, Plaintiff "again admits that the evidence did not support that [his] back impairment met Listing 1.04(A). [He] never alleged that his back impairment met or equaled a Listing." (Plaintiff's Response at 2-3.) "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was "inconsequential to the

ultimate nondisability determination.""" <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations omitted); <u>see also</u> <u>Ngarurih v. Ashcroft</u>, 371 F.3d 182, 190 n.8 (4th Cir. 2004). Considering that Plaintiff himself concedes that the evidence in the record does not establish the existence of Listing 1.04A, the undersigned finds that it is immaterial that the ALJ did not specifically address Listing 1.04A under <u>Cook</u>. <u>See</u> <u>Cowger v. Astrue</u>, No. 2:10-CV-41, 2010 WL 5631211, at *14 (N.D. W. Va. Sept. 29, 2010) (Joel, Mag. J.), <u>adopted by</u> <u>Cowger v. Astrue</u>, No. 2:10-cv-41, 2011 WL 220218 (N.D. W. Va. Jan. 21, 2011).

## D.    Treating Physician Rule

Also as part of his first contention, Plaintiff asserts that the ALJ "ignore[d] the treating physician rule by cloaking Dr. Witkowski's opinion under the guise that it was an opinion that infringed on the role of the Commissioner." (Plaintiff's Brief at 6.) Specifically, Plaintiff argues that Dr. Witkowski's opinion did not declare him to be disabled or unable to work, and that his opinion "was well-supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence in the record." (<u>Id.</u> at 9-12.) Defendant asserts that the ALJ reasonably evaluated Dr. Witkowski's letter and properly assigned less than controlling weight to his opinion. (Defendant's Brief at 11-13.) Upon review of the ALJ's decision, the undersigned has also included the State agency consultants, Drs. Pascasio and Reddy, in his discussion.

20 C.F.R. § 404.1527(c) states:

*How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*.  The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996).  The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).  In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

As to medical source opinions on issues reserved to the Commissioner, 20 C.F.R. § 404.1527(d) states:

> Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" ro "unable to work" does not mean that we will determine that you are disabled.

> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional

capacity) . . ., or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

Social Security Ruling ("SSR") 96-5p provides the following examples of "administrative findings that are dispositive of a case":

1.    Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;

2.    What an individual's RFC is;

3.    Whether an individual's RFC prevents him or her from doing past relevant work;

4.    How the vocational factors of age, education, and work experience apply; and

5.    Whether an individual is "disabled" under the Act.

SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  SSR 96-5p further provides:

Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis.  Adjudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.  Medical source statements are to be based on the medical sources' records and examination of the individual; i.e., their personal knowledge of the individual.  Therefore, because there will frequently be medical and other evidence in the case record that will not be known to a particular medical source, a medical source statement may provide an incomplete picture of the individual's abilities.

Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of an individual's impairment(s). Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be

necessary to decide whether to adopt or not adopt each one.

. . .

Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

. . .

Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

Treating source opinions on issues reserved to the Commissioner will never be given controlling weight.  However, the notice of the determination or decision must explain the consideration given to the treating source's opinion(s).

Id. at *4-6.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).  Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977).  The Administration has discussed the explanation of the weight to be given to a treating

source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>
> *is not fully favorable, e.g., is a denial; or
>
> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

Plaintiff first challenges the ALJ's classification of Dr. Witkowski's statement that Plaintiff "cannot sustain any type of physical activity for any duration" as equivalent to a statement that Plaintiff is disabled. (R. at 17, 271.) The undersigned notes that it is a "close[] question whether [this statement] is a medical opinion" or a statement on an issue reserved to the Commissioner. Morgan v. Barnhart, 142 F. App'x 716, 722-23 (4th Cir. 2005) (assuming without deciding that the statement "it would be hard [for Morgan] to sit or stand for a 5 hour day" was a "medical opinion due special weight"). It appears that Dr. Witkowski made this statement in connection with his longitudinal history of treating Plaintiff for his impairments.

In any event, the undersigned need not conclusively determine whether Dr. Witkowski's statement is a medical opinion or an opinion on an issue reserved to the Commissioner. A logical

nexus must exist between the weight accorded to opinion evidence and the record, and the reasons

for assigning such weight must be "sufficiently articulated to permit meaningful judicial review."

DeLoatch, 715 F.2d at 150.  With regards to Dr. Witkowski's opinion, the ALJ wrote:

> Likewise, the undersigned considered a statement from the claimant's primary care provider, Dr. Witkowski, during the period at issue, finding the claimant unable to sustain any type of physical activity for any duration because of a chronic problem (Exhibit 5F).  This statement is equivalent to a statement that the claimant is "disabled," which is not a medical opinion but is an administrative finding dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein, and therefore reserved to the Commissioner.  Such a statement can never be entitled to controlling weight, but must be carefully considered to determine the extent to which it is supported by the record as a whole or contradicted by persuasive evidence (20 CFR 404.1527(d)(2) and Social Security Ruling 96-5p).
>
> The undersigned accorded Dr. Witkowski's findings, in combination with the objective medical evidence of record, as to the nature and extent of the claimant's impairments, weight to the extent such findings showed that the claimant's ability to perform exertional work or non-exertional work were consistent with the majority of the objective findings in the medical evidence and consistent with the residual functional capacity above.

(R. at 17-18.)

Given this, the undersigned finds that the ALJ failed to "sufficiently articulate[]" reasons for

assigning little weight to the opinion of Dr. Witkowski as "to permit meaningful judicial review" by

this Court.  See DeLoatch, 715 F.2d at 150.  While the ALJ did discuss whether Dr. Witkowski's

opinion was consistent with the record, see 20 C.F.R. § 416.927(c)(4), he referred to his opinion in

a summary fashion without referencing a single opinion or piece of evidence with which it was

inconsistent.  At no point did he address any of the other factors set forth above when considering

Dr. Witkowski's opinion, including his statement that Plaintiff "cannot sustain any type of physical

activity for any duration."  (R. at 271.)

The undersigned notes that Dr. Witkowski's opinion may be entitled to less than controlling

weight. For example, Dr. Witkowski stated that he did "not see the patient getting much better in the long run" and that he was "unsure if would benefit from surgery at this point." However, Dr. Jones' January 23, 2014 notes indicate that surgery was an option, but that Plaintiff was "not highly interested in undergoing any surgeries for this back pain due to the family history of back problems and surgeries and his family members did not appear to get much better when they had back surgery." (R. at 287.) Furthermore, the record indicates that Plaintiff's pain has improved with his use of Neurontin. (R. at 47, 285.) On the other hand, Dr. Witkowski also stated that Plaintiff "has had big problems with continued back pain. There are times that the pain is going down his legs, primarily more on the left leg. It will go all the way to his toes. He will get numbness and tingling as well." (R. at 271.) This statement is supported by Dr. Witkowski's treatment notes (See R. at 226, 231, 232, 236, 239, 240, 241, 256, 257, 261, 273, 275, 276, 284.)

Dr. Witkowski's opinion letter is also supported by other substantial evidence in the record. For example, on August 24, 2011, NP Phillips saw Plaintiff and noted that his back was "[e]xtremely tender with guarding across lumbar area, greater at right." Plaintiff also had "[p]ositive paraspinal spasms at L5 through L7, slight bulging noted at spine, L5." His motion and activity were "slow" because of his back pain, and NP Phillips needed to assist him in getting up from a supine to a sitting position. Plaintiff was also unable to do leg raises, a forward bend, and a heel/toe walk because of his back pain. (R. at 283-84.) Furthermore, on January 23, 2012, Drs. Jones and Daffner reviewed Plaintiff's November 8, 2011 MRI. They confirmed that Plaintiff had mild-to-moderate frontal stenosis at the L4-L5 level on his right side and severe foraminal stenosis bilaterally at the L5-S1 level. (R. at 287.) Plaintiff's MRI further showed degenerative disc disease of the lumbar spine, lumbar spondylolisthesis and spondylolysis. (R. at 278-79.) Nevertheless, the ALJ failed to assess

this or any other evidence in discrediting Dr. Witkowski's opinion.  See DeLoatch, 715 F.2d at 150.

Even where a treating physician's opinions are not entitled to controlling weight, they are generally entitled to more weight than the opinion of a consultative physician.  See 20 C.F.R. § 416.927(d)(1).  With respect to the opinions of State agency physicians Drs. Pascasio and Reddy, the ALJ stated:

> Turning to the opinion evidence, the opinions of the State agency consultants who provided physical residual functional capacity assessments finding the claimant to be capable of work at a light exertional level with additional postural and environmental limitations were considered by the undersigned and accorded weight to the extent they were balanced and objective.  However, in giving the claimant the utmost benefit of the doubt, the undersigned did not accord these opinions substantial weight, as the experts did not have an opportunity to examine or treat the claimant, nor did they have access to the latest evidence, including testimony, as to the current level of severity of the claimant's impairments (Exhibits 2F and 4F).

(R. at 17.)

The ALJ's reasoning is contradicted by the record.  Although the ALJ states that he gave Plaintiff the utmost benefit of the doubt because the State agency physicians did not have access to later evidence and Plaintiff's testimony, the ALJ's RFC determination substantially mirrored the State agency physicians' opinions.  For example, the ALJ adopted the State agency physicians' findings that Plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; and stand, walk, and sit for about 6 hours in an 8-hour day.  (R. at 15, 248, 264.)  He also adopted the State agency physicians' findings that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (R. at 15, 249, 265.)  Furthermore, he adopted Dr. Pascasio's findings that Plaintiff could never climb ladders, ropes, and scaffolds and needed to avoid concentrated exposure to extreme cold, extreme heat, and excessive noise.  (R. at 15, 249, 251.)

While it is the exclusive province of the ALJ to weigh the evidence contained in the record,

the ALJ's findings cannot withstand judicial review when the ALJ fails to articulate its reasoning or substantiate its findings.  See id.; Miller v. Astrue, No. 1:12-cv-37, 2013 WL 588722, at *48-49 (N.D. W. Va. Jan. 156, 2013), aff'd by Miller v. Astrue, 2013 WL 557277 (N.D. W. Va. Feb. 13, 2013) (remanding case because "the ALJ's discussion of the treating physician's opinions [did] not comply with the regulations or rulings regarding treating physician opinions"); Trimmer, 2011 WL 4589998, at *6 (remanding case because ALJ failed to sufficiently articulate findings and provide substantial evidence for rejecting the opinion of a treating physician).  In sum, the undersigned finds that the ALJ failed to sufficiently articulate the weight and the reasons for such weight assigned to the opinion of Dr. Witkowski and State agency physicians Drs. Pascasio and Reddy.  Accordingly, the undersigned finds that the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence.

### E.    ALJ's Lay Opinion

Plaintiff further argues that the ALJ improperly substituted his judgment for that of the physicians whose opinions are contained in the record.  (Plaintiff's Brief at 14-15.)  Specifically, Plaintiff asserts that the "decision is based solely on the ALJ's own preconceived and premeditated medical opinions and judgments as to what [his] capabilities should be in order to avoid Med-Voc Guideline 201.10."  (Id. at 15.)  Defendant states that the ALJ did not rely on his lay opinion to formulate Plaintiff's RFC.  (Defendant's Brief at 14.)  The undersigned has already found that the ALJ failed to sufficiently articulate the weight and the reasons for such weight assigned to the opinions of Drs. Witkowski, Pascasio, and Reddy.  Accordingly, the undersigned does not address Plaintiff's contention.

## V. RECOMMENDED DECISION

For the reasons stated above, I find that the Commissioner's decision denying the Plaintiff's application for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and this action be **REMANDED** to the Commissioner for further action in accordance with this Recommendation for Disposition.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _21_ day of _April_, 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE